[L.A. No. 31787. Apr. 2, 1984.]

NISH NOROIAN FARMS, Petitioner, v.
AGRICULTURAL LABOR RELATIONS BOARD, Respondent;
UNITED FARM WORKERS OF AMERICA, AFL-CIO, Real Party in
Interest.

730

**COUNSEL**

Marion I. Quesenbery, Patricia J. Rynn and Dressler, Quesenbery, Laws & Barsamian for Petitioner.

Manuel M. Medeiros, Daniel G. Stone, J. Kenneth Donnelly and Ismael A. Castro for Respondent.

Dianna Lyons, Federico G. Chavez, Ellen A. Eggers, Daniel A. Garcia, Ira Gottlieb and Wendy Sones for Real Party in Interest.

**OPINION**

**GRODIN, J.**—Under a formula first adopted by the Agricultural Labor Relations Board (ALRB or Board) in *Sunnyside Nurseries, Inc.* (1977) 3 A.L.R.B. No. 42, backpay owed an unlawfully discharged employee for a particular day may be offset only by wages earned in outside employment on that same day. We granted hearing to consider the contention of Nish Noroian Farms (Noroian) that this formula is not a proper exercise of the Board's remedial discretion under the Agricultural Labor Relations Act (ALRA). We conclude that the rule can be applied fairly and must be upheld. We also rule that the Board could order Noroian to bargain about the California effects of its unilateral change in residency requirements for irrigators working in Arizona. We find that Noroian's remaining contentions lack merit as well. We therefore affirm the Board's order in full.

FACTS

Noroian, a sole proprietorship, engages in agriculture in both California and Arizona. On November 30, 1976, real party United Farm Workers of America (UFW) was certified by the ALRB as the collective bargaining representative for certain of Noroian's employees.

Negotiations for a collective bargaining agreement continued through 1977. During this period, each side filed charges with the Board that the

other was refusing to bargain in good faith. (Lab. Code, § 1153, subd. (e).)[1] On February 24, 1978, the UFW lodged a new charge with the Board—that Noroian had laid off, then refused to rehire, irrigator Emiliano Becerril on the basis of his union activities. (See § 1153, subds. (a), (c).)[2] The UFW designated this charge as number 77-CE-141-3-E, but the Board gave it the number 78-CE-10-E.

On May 8, 1978, the parties reached agreement on a contract. They also entered a written settlement of the pending unfair labor practice charges. By its terms, Noroian was to pay a specified sum to the ALRB for distribution to certain employees. The parties "mutually waive[d] any and all unfair labor practice charges alleging bad faith bargaining for conduct as of the date of the signing of this contract." A separate paragraph exempted the Becerril charge; it provided that "[c]harge 77-CE-141-3-E [78-CE-10-E] is not affected by the settlement agreement, and will be litigated separately."

On July 12, 1978, the Board's regional director dismissed the Becerril charge. At the UFW's request, the General Counsel reviewed the dismissal. On August 10, 1978, he affirmed the regional director's decision. However, he remanded for further investigation whether the refusal to rehire Becerril stemmed from a unilateral change in hiring policy about which Noroian had unlawfully failed to bargain.

That same day, Noroian signed a formal Board Settlement Agreement prepared by a staff attorney for the ALRB and later executed by all other parties. The formal agreement stipulated to entry of a Board order resolving the pending charges. It deemed the May 8 agreement a part of the record in the consolidated proceedings. It expressly provided that "the alleged layoff and failure by [Noroian] to rehire Emiliano Becerril" was not covered by the settlement and would "abide further investigation and independent resolution by the Board."

On January 12, 1979, the Board issued a complaint bearing the Becerril case number. The complaint alleged that sometime during December 1977, or January or February 1978, Noroian had implemented a new policy prohibiting the use of California residents to do irrigation work on its Arizona

---

[1] All statutory references are to the Labor Code unless otherwise indicated.

[2] It is an unfair labor practice under subdivision (c) "[b]y discrimination in regard to the hiring or tenure of employment, or any term or condition of employment, to encourage or discourage membership in any labor organization." Subdivision (a) makes it an unfair labor practice "[t]o interfere with, restrain, or coerce agricultural employees in the exercise of the rights guaranteed in [the ALRA]."

properties. "It was pursuant to this new policy that . . . Noroian refused to rehire . . . Becerril and John Does 1-10 on or about February 18, 1978." Noroian's failure to bargain about this change, said the complaint, was a violation of section 1153, subdivision (e).[3] The charge was later amended to include Arturo Baca, another irrigator, as a victim of the unlawful action.

The administrative law officer (ALO) rejected Noroian's claim that the refusal-to-bargain charge was barred by the prior settlement. He further found that Noroian had violated subdivisions (a) and (e) of section 1153 by "eliminating the use of employees who resided in California as Irrigators at its Arizona operations" without notifying the employees' bargaining representative about the impact of the change on their wages, hours, and working conditions. The ALO ordered, among other things, that Noroian cease and desist from refusing to bargain in good faith and that it bargain about the effect of the new policy. He also directed that Becerril and Baca be reinstated with backpay through the bargaining period, backpay "to be computed under the formula used in *Sunnyside Nurseries* [*supra*] . . . ."

In its exceptions to the Board, Noroian contended that it had no duty under the ALRA to bargain about Arizona work and hiring policies. The Board found it unnecessary to reach that issue, "since Respondent did not eliminate *only* Arizona work when it changed its dual-state irrigator policy, it eliminated the *California* component of Becerril's work as well. Thus, it unilaterally eliminated California unit work. . . ." (Italics in original.) On that basis, the Board affirmed the finding that Noroian had violated section 1153, subdivisions (a) and (e). Like the ALO, it imposed cease-and-desist, bargaining, reinstatement, and backpay remedies. The Board directed that backpay be computed "according to the formula stated in *J & L Farms* (Aug. 12, 1980) 6 ALRB No. 43, . . . ."

Noroian petitioned the Court of Appeal, Fourth Appellate District, for review. (§ 1160.8.) The court granted the petition in order to consider whether (1) the Becerril refusal-to-bargain charge was barred by the prior settlement, (2) the Board's finding that Becerril and Baca had lost work as the result of an unlawful unilateral policy change was within its jurisdiction and supported by substantial evidence, and (3) the remedial order was appropriate.[4]

---

[3] Under subdivision (e), it is an unfair labor practice "[t]o refuse to bargain collectively in good faith with labor organizations certified [under the ALRA]."

[4] The UFW lost a decertification election in December 1978. Its objections to the election, and related unfair labor practice charges against Noroian, were consolidated with the Becerril matter. The Board upheld the election but sustained a related charge that Noroian had engaged in an incident of coercive interrogation. (See § 1153, subd. (a).) The Court of

## The Settlement Agreement

█ The National Labor Relations Board (NLRB) refuses to consider evidence of unfair labor practices which antedate a settlement agreement. (*Larrance Tank Corporation* (1951) 94 N.L.R.B. 352, 353.) A major exception is conduct which was specifically reserved from settlement by mutual agreement of the parties. (*Steves Sash & Door Co.* (1967) 164 N.L.R.B. 468, 473, enforced, *Steves Sash & Door Company* v. *N. L. R. B.* (5th Cir. 1968) 401 F.2d 676.) The Board found that since the Becerril case was expressly excluded from the settlement between Noroian and the UFW, it could be litigated.

Noroian disputes the scope of the exclusion, contending it applied only to the original charge, based on section 1153, subdivision (c), that Becerril had been dismissed in retaliation for his union activity. As Noroian notes, the May 8 agreement included the parties' express waiver of "*any and all . . . charges* alleging *bad faith bargaining* for conduct *as of the date of the signing of this contract.*" (Italics added.) Noroian urges that the Board was therefore precluded from transforming the original discrimination charge into one alleging a refusal-to-bargain violation under subdivision (e).

We disagree. █ A written instrument must be construed as a whole, and multiple writings must be considered together when part of the same contract. (Civ. Code, §§ 1641, 1642.) The factual context in which an agreement was reached is also relevant to establish its meaning unless the words themselves are susceptible to only one interpretation. (*Id.,* § 1647; see *Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 38-40 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373].)

█ Here the waiver provision in the May 8 settlement must be examined in light of the formal August 10 agreement which incorporated and superseded it. Noroian emphasizes that the May 8 agreement reserved only "charge 77-CE-141-3-E" for further litigation. This Noroian urges, demonstrated an intent to confine the exception to the exact allegations which had already been made by the UFW. But the language of the exception contained in the August 10 formal settlement is much broader. It reserves "the alleged layoff and failure . . . to rehire . . . Becerril" for "further investigation" and "independent resolution" by the Board.

---

Appeal denied review of the interrogation issue and granted only to consider the Becerril case. Before us, Noroian has not disputed the Court of Appeal's power to grant review of some but not all issues. (Cf., *General Telephone Co.* v. *Public Utilities Com.* (1983) 34 Cal.3d 817, 820 [195 Cal.Rptr. 695, 670 P.2d 349]; *Tex-Cal Land Management, Inc.* v. *Agricultural Labor Relations Bd.* (1979) 24 Cal.3d 335, 350 [156 Cal.Rptr. 1, 595 P.2d 579]; Cal. Rules of Court, rule 29(b)(2).) We limit our discussion accordingly.

That language accords with labor policy and the practice of both state and national labor boards. Under the National Labor Relations Act (NLRA), the NLRB is not confined by the facts and theories framed in the original charge it receives. The boards are fora for the vindication of public, not private, rights, and a charge filed with either is not the equivalent of a court complaint. The original charge merely invokes the board's jurisdiction "to make full inquiry under its broad investigatory power" in the public interest. While the board is precluded from " 'expand[ing] the charge as [it] might please, or [ignoring] it altogether,' " the final complaint need not adhere "to the specific matters alleged in the charge . . . ." (*Labor Board* v. *Fant Milling Co.* (1959) 360 U.S. 301, 307-309 [3 L.Ed.2d 1243, 1247-1249, 79 S.Ct. 1179]; see also *Wirtz* v. *Laborers' Union* (1968) 389 U.S. 477, 482 [19 L.Ed.2d 716, 720, 88 S.Ct. 639]; *John Elmore, Inc.* (1978) 4 A.L.R.B. No. 98 (ALO Dec., pp. 36-37).)

Here the unfair practices alleged in the Board's complaint were "related to those alleged in the charge and [grew] out of them." (*Fant Milling Co., supra*, at p. 309 [3 L.Ed.2d at p. 1249].) The termination and refusal to rehire Becerril were the sole subject matter of both. Moreover, as required by its rules (Cal. Admin. Code, tit. 8 (hereafter Regs.), § 20210), the Board's amendment of the initial charge was issued under the original docket number.

Thus, absent the settlement, the amended charge was well within the Board's power. By reserving the Board's authority to investigate the Becerril case further and resolve it independently, the parties must have intended to allow the litigation of unfair labor practices which emerged from that incident.

The May 8 waiver of "any and all" past refusal-to-bargain charges does not persuade us otherwise. That language is most easily understood as eliminating the pending bad-faith charges which had arisen from the negotiation process itself. We doubt its purpose was to foreclose the Board from full investigation of a matter expressly reserved in the settlement.[5]

Noroian argues that this construction violates the policy of encouraging settlements to achieve labor peace. (See, e.g., *Fox River Pattern, Inc.* (1972) 199 N.L.R.B. 68, 70, enforced, *Fox River Pattern, Inc.* v. *NLRB* (7th Cir. 1973) 483 F.2d 1406, cert. den. (1974) 416 U.S. 938 [40 L.Ed.2d

---

[5]The ALO reached the same conclusion by finding, among other things, that when the UFW negotiator signed the May 8 agreement, he lacked knowledge of Noroian's unilateral change in hiring policy. The evidence on that issue is in conflict, and the Board did not adopt the ALO's finding. We deem it unnecessary to our analysis.

289, 94 S.Ct. 1939].) That contention is not convincing since the UFW bargained specifically to reserve the Becerril matter for resolution outside the settlement.

Noroian cites *John J. Elmore* (1980) 6 A.L.R.B. No. 7, as holding that all pending refusal-to-bargain charges are foreclosed by a subsequent collective bargaining agreement. There, as here, the employee's original claim of unlawful discharge was framed on a discrimination theory. While contract negotiations proceeded, the Board's staff discovered evidence that the discharge involved an unlawful refusal to bargain. The Board rejected a complaint issued on the latter ground after the agreement was signed. In *Elmore,* however, the union never reserved the employee's complaint for litigation, nor did it participate in the Board proceeding. Thus, resurrection of the charge would have disrupted the peace established by the contract. Such is not the case here.

Noroian urges that the amended charge was disruptive because it changed the focus from one employee to an entire bargaining unit. We need not address that abstract issue. Here, only Becerril and one other employee, Arturo Baca, were practically affected by the Board's decision. That is hardly a dangerous expansion of the scope of the original charge. We conclude that litigation of the refusal-to-bargain charge was not foreclosed by the settlement.

■ Finally, Noroian contends that the Board was precluded from amending the complaint to insert Baca's name in addition to Becerril's, since the Baca case had not been reserved in the settlement. However, Noroian's counsel expressly declined to object to the amendment before the ALO, and Noroian did not raise the issue in its exceptions to the Board. Hence, it has waived the issue. (*Butte View Farms* v. *Agricultural Labor Relations Bd.* (1979) 95 Cal.App.3d 961, 971 [157 Cal.Rptr. 476].)

### The Duty to Bargain

Noroian raises several objections to the Board's determination that it violated its duty to bargain under section 1153, subdivision (e), by unilaterally introducing a policy requiring Arizona residence for Arizona irrigation work. ■ Noroian first contends that the Board has thus impermissibly asserted extraterritorial jurisdiction over terms and conditions of employment in Arizona.

We disagree. The Board found it did not need to reach the issue of Noroian's duty to bargain in Arizona, "since Respondent did not eliminate

*only* Arizona work when it changed its dual-state irrigator policy, it eliminated the *California* component of Becerril's work as well." (Italics in original.)

The Board did not elaborate, and its choice of words is cryptic. However, we interpret its language as *declining* to tell Noroian it must bargain with the California-certified UFW about the decision to transfer work away from the California bargaining unit to residents of another state.[6] Rather, the Board limited its focus to the resulting changes in the allocation of work performed by the unit *within California.* These changes, in turn, had contributed to the failure to rehire members of the California unit to work *in this state.* The Board ruled only that Noroian was obliged to negotiate about these purely *California effects* of its actions.

It is difficult to question the Board's power to do so. But for considerations of territorial jurisdiction, Noroian's unilateral policy change was certainly a mandatory subject of bargaining under the California ALRA.

Under both the ALRA and the NLRA, a covered employer must bargain in good faith with its employees' certified representative over "wages, hours, and other terms and conditions of employment." (§§ 1153, subd. (e), 1155.2, subd. (a); see 29 U.S.C.A. § 158(a)(5), (d).) ■ Hence, the employer "may not unilaterally attempt to divert work away from a bargaining unit without fulfilling his statutory duty to bargain. . . ." (*Road Sprinkler Fitters Local U., etc.* v. *N. L. R. B.* (D.C. Cir. 1982) 676 F.2d 826, 831; see *Fibreboard Corp.* v. *Labor Board* (1964) 379 U.S. 203, 209 [13 L.Ed.2d 233, 237, 85 S.Ct. 398, 6 A.L.R.3d 1130].)

The duty applies whenever work is transferred from bargaining unit employees to nonbargaining unit employees (*Soule Glass and Glazing Co.* v. *N. L. R. B.* (1st Cir. 1981) 652 F.2d 1055, 1088), causing the bargaining unit to suffer an adverse impact (*Office and Professional Emp. Int. U., Local 425* v. *N. L. R. B.* (D.C. Cir. 1969) 419 F.2d 314, 321). An "adverse impact" occurs when the reduction in unit work produces layoffs or the failure to rehire laid-off members of the unit who would otherwise have been rehired. (*Amcar Div., ACF Industries* (1977) 231 N.L.R.B. 83, 89-90, enforced, *Amcar Division, ACF Industries, Inc.* v. *N. L. R. B.* (8th Cir. 1979) 592 F.2d 422, 428.) ■ Here, in keeping with the agricultural context, the unit was transferred away from its work, rather than vice versa, but the effect is exactly the same.

---

[6]Thus, we are not presented with that difficult issue, and we do not decide it.

Under these circumstances, even if Noroian was insulated from bargaining liability under the ALRA insofar as its unilateral policy change was implemented in another state, the act's coverage certainly extends at least to the *California results* of the change. ■ Labor law has long recognized that certain business *decisions* can be taken without consulting the union, but the employer may still be required to bargain about the effects of such decisions on the wages, hours, and working conditions of his employees. (E.g., *N. L. R. B.* v. *International Harvester Co.* (9th Cir. 1980) 618 F.2d 85, 88; *N. L. R. B.* v. *Transmarine Navigation Corporation* (9th Cir. 1967) 380 F.2d 933, 939; *N. L. R. B.* v. *Rapid Bindery, Inc.* (2d Cir. 1961) 293 F.2d 170, 176.)

■ As we interpret the Board's decision, it has taken that approach here, limiting its bargaining order to the adverse employment impact suffered by the California unit within California. So construed, the order offends no notion of territorial jurisdiction.

Noroian raises the possibility of conflicts in its bargaining responsibilities to California- and Arizona-certified bargaining representatives. We fail to see, however, how Noroian's responsibility to bargain with California employees about their employment in California could conflict with its obligations to a collective bargaining representative of the new Arizona workers.

Noroian argues that the Board's assertion of authority violates principles of due process and full faith and credit. But there can be no due process impediment to California's resolution of the California aspects of a California employment relationship between California parties. Nor is there evidence that the Board's decision constitutes an interference with Arizona policy which might invoke the full faith and credit clause. (See *Nevada* v. *Hall* (1979) 440 U.S. 410, 421, 424 [59 L.Ed.2d 416, 425, 427, 99 S.Ct. 1182].)

■ Noroian suggests there is no substantial evidence that the failure to rehire Becerril and Baca for work in California was the result of the change in hiring policy. But the record amply supports the Board's conclusion.

Prior to February 1978, Noroian typically employed up to five full-time irrigators, including Becerril and Baca, to perform its irrigation work in both California and Arizona. These employees were part of the California bargaining unit certified by the ALRB in 1976. Noroian's farms in the two states were about thirty miles apart, and bargaining unit employees appar-

ently were used interchangeably in both California and Arizona as need dictated.

Becerril, a Noroian employee for several years, had been laid off in December 1977 during the winter hiatus in irrigation. In the past, he had been rehired when the "water returned" in February. In the interim, however, a senior member of the unit, Beltran, suggested to Noroian's foreman that it was inconvenient for California residents to work on the Arizona farm. Accordingly, in February 1978, Noroian instituted the policy requiring Arizona residence to do Arizona irrigation work. Thereafter, Noroian employed a maximum of two full-time irrigators in California. That number, Noroian's foreman testified, is all he has had in California "since this policy went into effect."

Employment in California was based on seniority, and Becerril and Baca, both California residents, were junior to the irrigators retained in California. Neither was rehired. The Board could therefore infer, as it did, that the change in policy reduced the total amount of work being done by California irrigators and prompted reallocation of the *California* work within a unit of diminished size.

Noroian contends there is no evidence that the total amount of *California* work was reduced. The argument misses the point; no such proof is necessary. It was the decision to take *Arizona* work from California unit members which produced the adverse reallocation of California work. That alone supports the conclusion that these California effects were subject to the duty to bargain.

■■■ Noroian claims it was unfairly surprised by the Board's jurisdictional reliance on the "California component" of the dual-state irrigator policy, since that issue had not been addressed in the complaint, evidence, arguments, or ALO decision. We cannot agree.

First, we must conclude that the complaint itself was not deficient for the Board's purpose. ■■■ Variances between complaint and decision will be ignored if the party charged actually understood what was in dispute and had an opportunity to respond. (*Labor Board* v. *Mackay Co.* (1938) 304 U.S. 333, 349-350 [82 L.Ed. 1381, 1392-1393, 58 S.Ct. 904].) " ' "All that is requisite in a valid complaint . . . is that there be a plain statement of the things claimed to constitute an unfair labor practice [so] that respondent may be put on his defense." [Citation.] Such a complaint need state only the manner by which the unfair labor practice has been or is being committed, the absence of specifics being tolerated where there has been no

special showing of detriment.' " (*Owens-Corning Fiberglas Corporation* v. *N. L. R. B.* (4th Cir. 1969) 407 F.2d 1357, 1361, quoting *Curtiss-Wright Corp., Wright Aero. Div.* v. *N. L. R. B.* (3d Cir. 1965) 347 F.2d 61, 72 [fns. omitted].)

 The Board's complaint alleged that sometime between December 1977 and February 1978, Noroian "instituted and implemented a new policy regarding the hiring of California workers to do work on its Arizona properties." According to the complaint, "[i]t was pursuant to this new policy that . . . Noroian refused to rehire . . . Becerril and . . . Baca on or about February 18, 1978." By taking these actions, the complaint said, Noroian "made unilateral changes regarding the terms and conditions of employment of its employees in violation of its duty to bargain" under section 1153, subdivision (e) and interfered with protected rights in violation of subdivision (a).

The pleadings were thus clear and specific; they identified particular incidents and linked them to the unfair labor practices being asserted. No different evidence was introduced, and the Board's decision conformed exactly to the issue framed. (Compare, e.g., *Bob's Casing Crews, Inc.* v. *N. L. R. B.* (5th Cir. 1970) 429 F.2d 261, 263; *General Teamsters and Allied Wkrs. U. No. 992* v. *N. L. R. B.* (D.C. Cir. 1970) 427 F.2d 582, 588-589; *Boyle's Famous Corned Beef Company* v. *N. L. R. B.* (8th Cir. 1968) 400 F.2d 154, 163-165.)

Nor is it crucial that the "California component" of Noroian's policy received no special attention at intermediate stages of the proceeding. As the ultimate factfinder (§ 1160.3), the Board could draw any reasonable factual inferences in support of its decision. And it could employ any legal analysis it deemed necessary to uphold the charges pled and proved, regardless of the parties' failure to raise it.

Noroian claims it believed it was only being held accountable for the Arizona effects of its policy. Had it known otherwise, it urges, it would have made a different factual showing. But Noroian's interpretation of the pleadings is not a fair one. The complaint referred to the change in conditions affecting "California workers," Becerril and Baca in particular. It was indisputable that those men had worked for Noroian in *both* states before the policy change; afterwards they were rehired in neither. Noroian had no reasonable ground to believe it could safely ignore the California impact of its unilateral decision. And it points to no evidence it would have introduced. (See *Rivcom Corp.* v. *Agricultural Labor Relations Bd.* (1983) 34 Cal.3d 743, 767 [195 Cal.Rptr. 651, 670 P.2d 305].)

Even if the Board's theory surprised Noroian, there was no denial of due process. Under the Board's procedures, an aggrieved party may move for reopening or reconsideration of the agency's decision on grounds of "extraordinary circumstances." (Regs., § 20286, subd. (c).) The federal cases hold that the NLRB's similar provision (29 C.F.R. § 102.48(d)(1)) may be invoked when the national board adopts a remedy *sua sponte*. (*N. L. R. B.* v. *Sambo's Restaurant, Inc.* (9th Cir. 1981) 641 F.2d 794, 795-796; *N. L. R. B.* v. *Allied Prod. Corp., Richard Bros. Div.* (6th Cir. 1977) 548 F.2d 644, 653-654.) The motion is equally appropriate here, where Noroian complains that the Board's decision rests on grounds not previously addressed by the parties.

Thus, Noroian had an opportunity to present its objections to the Board and to seek a reopening for further evidence if that appeared necessary. Under those circumstances, Noroian cannot argue that it was denied fair procedure.[7] We therefore uphold the Board's finding that Noroian violated the act.

---

[7]We are aware of Court of Appeal rulings that a motion for reconsideration does not toll the 30-day statutory period within which an aggrieved party must petition in an appellate court for review of the Board's "final order." (§ 1160.8; *Jackson & Perkins Co.* v. *Agricultural Labor Relations Bd.* (1978) 77 Cal.App.3d 830, 833-834 [144 Cal.Rptr. 166]; *United Farm Workers* v. *Agricultural Labor Relations Board* (1977) 74 Cal.App.3d 347, 349 [141 Cal.Rptr. 437].) The NLRA imposes no similar deadline on petitions for review. (29 U.S.C.A. § 160(f); *Buchanan* v. *N.L.R.B.* (4th Cir. 1979) 597 F.2d 388, 392.)

Under ALRB procedure, the motion for reconsideration must be filed "within 10 days after the service of the Board's final decision and order." (Regs., § 20286, subd. (c), *supra.*) Thereafter, the Board's jurisdiction to "modify or set aside" its order continues "[u]ntil the record in a case shall have been filed in a court." (§ 1160.3.) That, in turn, occurs within 10 days after the clerk of a Court of Appeal notifies the Board that a petition for review has been filed. (§ 1160.8.) The court must have the record before deciding whether to grant or deny the petition for review. (*Tex-Cal Land Management, Inc.* v. *Agricultural Labor Relations Bd., supra,* 24 Cal.3d 335, 351.)

The fact that the Board's power to modify or reconsider overlaps the deadline for petitions for review may create a trap for the unwary. If the Board has not acted on a motion for reconsideration during the 30-day period for petitions for review, it appears that the aggrieved party must file a protective petition. (See *Jackson & Perkins Co., supra,* 77 Cal.App.3d 830.)

Thereafter, the process is fairly logical. If the Board still has not acted by the time the administrative record is transmitted to the Court of Appeal, the motion for reconsideration is denied by operation of law, and the Court of Appeal may proceed on that assumption. On the other hand, if within the jurisdictional time the Board "modif[ies]" its order, both the 10-day period to move for reconsideration and the 30-day period to petition for review begin again. That is because the modification becomes the "final order" of the Board. By the same token, if by granting reconsideration, the Board "set[s the prior] order aside," there is no "final order." New 10-day and 30-day periods will commence only when the Board issues a new "final order" after reconsideration. In both cases, a superseded petition for review could be dismissed as moot by the Court of Appeal.

## The Backpay Formula

█ An unlawfully discharged employee must use reasonable diligence to mitigate his loss by seeking other suitable employment; sums earned from the interim work are deducted from the backpay otherwise due. (E.g., *N. L. R. B.* v. *Madison Courier, Inc.* (D.C. Cir. 1972) 472 F.2d 1307, 1318-1319; *National Labor Relations Bd.* v. *Southern Silk Mills* (6th Cir. 1957) 242 F.2d 697, 700.) In ordering reinstatement and backpay for Becerril and Baca, the Board provided that interim employment deductions be computed on a day-by-day basis.

Under this formula, first announced in *Sunnyside Nurseries, Inc., supra,* 3 A.L.R.B. No. 42, wages the employee earns elsewhere on days he would not have worked for the original employer in any event may not be subtracted from the backpay award. Thus, as Noroian puts it, "[i]f a claimant would have worked on Monday, Tuesday, Thursday, and Friday of a specific week but for the [unlawful discharge], then his interim earnings for Wednesday of that week will not be offset against the employer's liability. . . ."

█ Noroian urges vehemently that the formula is punitive and beyond the Board's remedial discretion. We think Noroian waived the issue, however, by failing to challenge the ALO's decision on that ground. The ALO expressly imposed the *Sunnyside* backpay formula. Noroian did not demur to that remedy in its exceptions and brief to the Board. The Board, in turn, issued a backpay order based on *J & L Farms* (1980) 6 A.L.R.B. No. 43. The *Sunnyside* and *J & L Farms* formulae are semantically identical.[8] Noroian makes vague claims that they have been implemented differently but provides no explanation.

Noroian's failure to exhaust its administrative remedies forecloses any argument in this court that *imposition* of a "daily" backpay formula was beyond the Board's power in general. (See *Butte View Farms* v. *Agricultural Labor Relations Bd., supra,* 95 Cal.App.3d 961, 971.)[9] Of course, the formula has not yet been applied to the particular facts of this case. That will

---

[8]Each provides in relevant part that "[l]oss of pay is to be determined by multiplying the number of days the employee was out of work by the amount the employee would have earned per day. If on any day the employee was employed elsewhere, the net earnings of that day shall be subtracted from the amount the employee would have earned [from the violating employer] for that day only. . . ." (*J & L Farms, supra,* 6 A.L.R.B. No. 43, p. 2; *Sunnyside Nurseries, Inc., supra,* 3 A.L.R.B. No. 42, p. 4.)

[9]Therefore, we need not consider the claim that Noroian also failed to exhaust its remedies by declining to move for reconsideration of the Board's decision. (See Regs., § 20286, subd. (c), and related discussion *ante.*)

occur in a supplementary proceeding to determine the exact amount of backpay due. (See Regs., § 20290.) Since the fair application of the formula will inevitably arise in the supplementary backpay proceeding, we consider that issue for the parties' guidance.

 At the outset, we reject any suggestion that the formula is unfair because it departs from the NLRA policy of offsetting interim earnings against backpay on a *quarterly* basis, as provided in *F. W. Woolworth Company* (1950) 90 N.L.R.B. 289.[10] *Woolworth* is applied only to the industrial norm of steady, year-round employment. Noroian concedes that the NLRB uses a formula similar to that of *Sunnyside* and *J & L Farms* where the violating employer had offered only sporadic employment.

The national board's "practice is that during a period when no gross earnings are attributable to [an unlawfully discharged employee], . . . no deductions are made either for interim earnings or willful loss during this same time. The reason for this rule is that under the circumstances, there is no occasion for the [employee] to attempt to minimize his loss of earnings, *as there would have been none during this time, even if he had not been unlawfully discharged."* (*Brotherhood of Painters, etc.* (1957) 117 N.L.R.B. 1596, 1598, italics added; accord: *San Juan Mercantile Corp., etc.* (1962) 135 N.L.R.B. 698, 699; see *Alaska Steamship Company* (1955) 114 N.L.R.B. 1264, 1266-1267.) Indeed, in appropriate cases, the NLRB employs an "hourly" formula. Earnings from supplementary work the employee performs outside the hours he would have worked for the original employer are not deductible from gross backpay. (*S. E. Nichols of Ohio* (1981) 258 N.L.R.B. 1, 15.)

The ALRB's similar rule, which it applies generally, is based on the seasonal and sporadic nature of agricultural employment. For employment of that kind, a daily formula makes eminent sense. Noroian does not dispute that farm workers are often hired on a day-by-day or part-week basis; they may spend a typical work week in the service of several different growers. A worker hired for a three-day week remains available for employment elsewhere on the other two days. No one would suggest that earnings from jobs on those two days should be subtracted from his pay for the three-day employment.

The situation is no different after the employee is discharged unlawfully from the three-day job. Subsequent earnings from other employers on the

---

[10]Under the *Woolworth* formula, outside earnings for a three-month period are deducted from backpay otherwise due the employee for the same three-month period.

other two days are not a substitute for the lost three-day employment. The principal goal of a backpay award, "[to restore] the situation, as nearly as possible, to that which would have obtained but for the illegal [discharge]" (*Woolworth, supra,* 90 N.L.R.B. at p. 292), can only be achieved by continuing to recognize the separateness of those earnings.

In the context of seasonal or sporadic employment, the daily formula also serves the other objectives cited in *Woolworth.* Before that decision, the general rule had been to deduct interim earnings for the *entire* backpay period from gross backpay for that entire period. This encouraged an employer to delay reinstatement until higher wages from interim employment eliminated any liability for the net backpay. It also influenced employees to waive reinstatement in order to preserve backpay already accrued. *Woolworth* sought to eliminate these windfalls to wrongdoing employers. (90 N.L.R.B. at p. 292.)

Without a daily formula, an agricultural employer who had discharged a three-day employee unlawfully could escape liability by withholding reinstatement as long as the employee's earnings elsewhere during the other two days were higher. And the employee might be induced to waive reinstatement to his three-day job in order to prevent the further offset of earnings on the other two days against accrued backpay.

Noroian argues, however, that the Board has no right to "assume" the sporadic nature of agricultural employment. Here, it urges, the record shows Becerril and Baca had been employed steadily during the irrigation season. But the Board may rely on cumulative experience in devising its remedies. (*Labor Board* v. *Seven-Up Co.* (1953) 344 U.S. 344, 348-349 [97 L.Ed. 377, 382-383, 73 S.Ct. 287].) It has often confronted problems of daily turnover in California agriculture. (See, e.g., *Donley Farms, Inc.* (1978) 4 A.L.R.B. No. 66 (ALO Dec., pp. 10-11) [peak employment determination]; *G & S Produce* (1978) 4 A.L.R.B. No. 38 (ALO Dec., pp. 4-7) [same]; *High and Mighty Farms* (1977) 3 A.L.R.B. No. 88 (ALO Dec., pp. 5-7) [same].)

■ The Board, an expert agency, has broad discretion to fashion remedies to effectuate the purposes of the act. Courts will interfere only where those remedies are patently unreasonable under the statute. (*Fibreboard Corp.* v. *Labor Board, supra,* 379 U.S. 203, 216 [13 L.Ed.2d 233, 241]; *Jasmine Vineyards, Inc.* v. *Agricultural Labor Relations Bd.* (1980) 113 Cal.App.3d 968, 982 [170 Cal.Rptr. 510].) ■ We cannot say that the *Sunnyside-J & L Farms* formula, expressed as a general principle, is an unreasonable exercise of the Board's jurisdiction.

That a "daily" formula is a proper rule of thumb, however, does not mean it may fairly be applied in an identical manner to all situations. It would be unfair not to offset wages from true substitute employment, even if the new work is performed on different weekdays, or even in different seasons, than was the unlawfully terminated job. For example, if an agricultural employee replaced a steady full-time Wednesday-Sunday job with similar full-time Thursday-Tuesday work under circumstances indicating the latter position was a true substitute for the former, his Monday and Tuesday wages in the new position should not be exempt from offset.

The Board concedes that, in the supplementary backpay proceedings, the employer may introduce evidence of the discharged employee's work history. The *Sunnyside-J & L Farms* formula will then be applied equitably to the facts adduced.

*Mario Saikhon, Inc.* (1983) 9 A.L.R.B. No. 50 illustrates the Board's policy. There the Board calculated backpay for an unlawfully discharged Imperial Valley lettuce worker. The prior remedial order had called for back wages computed under the *Sunnyside* formula. (*Mario Saikhon, Inc.* (1979) 5 A.L.R.B. No. 44, p. 6, fn. 5.)

However, the Board reviewed the employee's particular work history to determine how the formula should be applied to his case. He had established a pattern of working steadily and full-time during the Imperial Valley lettuce season but taking the rest of the year off. After his discharge, he moved permanently to Salinas, where lettuce is harvested at a different time of year. There he resumed his pattern of full-time single-season employment in lettuce. The Board concluded that the subsequent employment, though it occurred only during days and seasons when the employee would not have worked for his former employer, was a substitute for the prior. It therefore ordered an offset against backpay. (9 A.L.R.B. No. 50, pp. 5-6.)

Similarly, Noroian may introduce evidence of Becerril's and Baca's employment history. We assume the Board will then determine whether any interim wages earned during days of the week other than those on which the two would have worked for Noroian are or are not true substitutes for the backpay lost.[11] By doing so, it can easily avoid any unfair award.

---

[11]The evidence already available suggests that Becerril and Baca were employed steadily except for annual layoffs during the winter hiatus in irrigation at Noroian. Becerril and Baca were, of course, available for other work during any such hiatus periods. Thus, amounts they have earned from other employment during subsequent winter seasons should not be deducted from the gross pay they would have earned from Noroian in other seasons. (*Phelps Dodge Corp.* v. *Labor Board* (1941) 313 U.S. 177, 198, fn. 7 [85 L.Ed. 1271, 1285, 61

## POSTING AND MAILING REQUIREMENTS

■ The Board ordered Noroian to post a Notice to Agricultural Employees advising of the Board's action, to allow a reading of the Notice to employees on company time, and to mail the Notice to all persons employed between September 24, 1980, and the date of mailing. Noroian complains that the reading and mailing requirements are punitive. It argues that such remedies are justified only where the flagrant and egregious nature of employer conduct permits an assumption that employees not directly involved had become aware of it. (Citing *M. B. Zaninovich, Inc.* v. *Agricultural Labor Relations Bd.* (1981) 114 Cal.App.3d 665, 686-687 [171 Cal.Rptr. 55].)

Here there was evidence that the refusal to rehire Becerril and Baca, as well as the coercive interrogation also found by the Board, had become public knowledge among Noroian's employees. In that context, the violations were neither "isolated" nor "technical." (*Id.,* at p. 689.) Thus, the mailing requirement is properly calculated to reach both past and present employees who may have been intimidated by the employer's conduct. It also permits them to examine the Notice in private.[12] And the Board may assume from experience that a reading requirement is necessary to dispel the effects of the employer's conduct among illiterate workers. (*Tex-Cal Land Management, Inc.* v. *Agricultural Labor Relations Bd., supra,* 24 Cal.3d 335, 355.)

The relatively small cost to the employer of these remedies does not render them inappropriate. (*Jasmine Vineyards, Inc., supra,* 113 Cal.App.3d 968, 981.) We believe they were within the Board's discretion.[13]

## CONCLUSION

We conclude that Noroian has raised no meritorious objection to the Board's order. We therefore order it enforced in full.

---

S.Ct. 845, 133 A.L.R. 1217]; *Golay & Co.* v. *N. L. R. B.* (7th Cir. 1971) 447 F.2d 290, 295, cert. den. (1972) 404 U.S. 1058 [30 L.Ed.2d 745, 92 S.Ct. 737].) By the same token, however, Noroian would have no backpay liability for seasonal layoffs unrelated to Noroian's unlawful conduct. (Compare *Alaska Steamship Company, supra,* 114 N.L.R.B. 1264, 1266-1267.)

[12]We confess some bewilderment as to why the Board chose to order mailing to persons employed on or after September 24, 1980, a date long subsequent to any unfair labor practice involved in this case.

[13]Noroian suggests that, since the Board addressed only the California effects of Noroian's unilateral change in irrigator hiring policies, reinstatement and backpay should be confined to work Becerril and Baca would have performed *in California* absent the change. We so interpret the Board's order.

Broussard, Acting C. J., Mosk, J., Kaus, J., Reynoso, J., Lui, J.,* and Woods, J.,* concurred.

*Assigned by the Chairperson of the Judicial Council.