[No. G038623. Fourth Dist., Div. Three. May 30, 2008.]

CALIFORNIA NATIONAL BANK, Plaintiff and Appellant, v. WOODBRIDGE PLAZA LLC, Defendant and Respondent.

Counsel

Locke Lord Bissell & Liddell, Joshua D. Wayser and Sheela H. Shah for Plaintiff and Appellant.

The Sall Law Firm, Robert K. Sall and Lara A. S. Callas for Defendant and Respondent.

Opinion

**RYLAARSDAM, Acting P. J.**—This appeal involves interpretation of a provision dealing with calculation of rent for the extended term of plaintiff California National Bank's lease of premises owned by defendant Woodbridge Plaza LLC. The language in question provides plaintiff's new rent, to "be at the then prevailing rate," is not to exceed rent paid by a competitor bank or "successor" in the same shopping center. At the time of plaintiff's extension, however, the competitor was defunct and its space had been divided and leased to six smaller, nonbank tenants. The court found "successor" meant successor in interest and since there was none, ruled that plaintiff was required to pay the prevailing rate paid by nearby financial institutions as calculated by defendant's expert witness.

Plaintiff contends the provision in question was not ambiguous and required no interpretation but that instead "successor" plainly meant successor to the space, not a successor bank. On that basis, then, rent should have been limited to a blended rate of the rent paid by all six "successor" tenants. It also maintains that if the judgment is reversed, the award of attorney fees to defendant should be reversed as well and that we should award attorney fees and costs to plaintiff on appeal.

We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff's predecessor in interest, Fidelity Federal Savings & Loan, entered into a 25-year lease for retail banking space in Woodbridge Plaza, to commence in December 1979. The lease called for triple net rent (meaning the tenant pays for property taxes and expenses) of approximately $1.08 per square foot per month. Paragraph 6 of the lease provided plaintiff's basic rent was to be increased every three years by approximately 12.5 percent. It also stated: "There shall be no decrease in the monthly [b]asic [r]ent for any reason at any time, except as may be set forth hereinafter." Two later

paragraphs in the lease provide for rent reduction when the premises were being reconstructed after damage or when a part of the premises was taken by eminent domain.

At the same time Bank of Irvine entered into a 25-year lease in a separate building in the same center. It occupied two floors, a retail bank on the ground floor and offices on a mezzanine. It also had a triple net lease, with rent for the ground floor bank space at $1.15 per square foot per month triple net. This was higher than the upper floor office space. Rent was to be adjusted periodically throughout the lease term based on the consumer price index. It had an option to extend the lease for 10 years. The two banks were the major tenants in the center.

Paragraph 3 of plaintiff's lease also has an option to extend the term for 10 years. It provides: "Such extension shall be subject to the terms and conditions set forth [in the lease], excepting the rent which shall be at the then prevailing rate. However, said rental rate shall not exceed the latest square foot rental paid by the Bank of Irvine or successor in Woodbridge Plaza for ground floor space."

In 1984 Bank of Irvine ceased doing business and defaulted on its lease after being taken over by regulators; there was no successor bank. When defendant's attempts to lease the entire space to a financial institution or any single tenant failed, it remodeled and divided the space. As of the date plaintiff exercised its option to extend, the old Bank of Irvine premises housed six retail and professional tenants, including medical professionals and a salon.

Prior to the end of plaintiff's lease term, defendant offered to renew the lease at the same rent amount plaintiff was then paying, $2.47 per square foot per month triple net. Plaintiff rejected the offer and countered, offering to pay the equivalent of $1.54 per square foot per month triple net. Subsequently plaintiff notified defendant it was exercising its option to extend, but included several different lease provisions, which defendant did not accept.

When the parties could not come to terms as to the new rent amount, they entered into an agreement stating that, although the option had been exercised, the parties had not agreed to the new rent amount. Therefore plaintiff would continue to pay rent at its then current rate, $2.47 per square foot per month triple net, and once the new amount was determined rent would be adjusted.

Subsequently plaintiff filed this action for declaratory relief to have the court determine the rent for the extended lease term. It alleged that its lease

provided it was to use the premises for a financial institution and contended this "require[d] that the fair market rental rate determination be based on space with similar uses, not just any use." It also alleged that the rent cap in paragraph 3 still applied, despite the demise of Bank of Irvine, and that its new rent should be "the lesser of (i) the fair market rental rate for bank space, or (ii) the rental rate for the [Bank of Irvine premises] as that rent may be determined by this [c]ourt."

At trial plaintiff put on evidence that during the negotiations about the renewal rent amount it always intended the rent cap should apply. Plaintiff's expert testified as to two alternatives for the new rent. One was a blended rate of rent for all six tenants occupying Bank of Irvine space, equal to $1.50 per square foot per month triple net. The other was a fair market rental of $2.50 per square foot per month triple net. He intentionally did not include rent for any financial institutions in the calculation. He also testified he had completed an appraisal for another bank two blocks away and found its fair market rent was $3.50 a month per square foot triple net.

The original developer and general partner of defendant, William Davis, testified that he signed the original lease for plaintiff's premises, although he did not remember negotiating paragraph 3 in particular or the lease at all. He testified the phrase "then prevailing rate" in paragraph 3 means that rent would be the same as that "paid for like space, like financial institutions in a similar area." He also stated that the next sentence, which states that rent "shall not exceed" that "paid by the Bank of Irvine or successor," means that plaintiff's rent would not be higher than rent for ground floor space of either Bank of Irvine or "another financial institution taking bank space . . . ." He understood "successor" to mean "someone in a like business taking over that space . . . and continuing in the same type of business . . . ."

Defendant's expert testified the fair market rental for space used as a financial institution was $3.00 per square foot per month triple net. He used eight banks in the surrounding area as comparables. Their rents ranged from $2.65 to $4.83 per square foot.

After a bench trial the court ruled in favor of defendant, finding, "as a matter of law and interpreting the [l]ease," that "successor" in paragraph 3 meant "a legal successor-in-interest who has assumed the rights and obligations of the Bank of Irvine," not merely "another tenant occupying the ground floor space formerly occupied by the Bank of Irvine, or . . . another bank or financial institution occupying the ground floor space formerly occupied by the Bank of Irvine, unless [it had] assumed the [l]ease obligations of the Bank of Irvine and [become] a legal successor-in-interest." There was no evidence of a successor as thus defined, and the current tenants in the former Bank of

Irvine space do not fall within that definition. On that basis the court held "the language regarding 'Bank of Irvine or successor' in [p]aragraph 3 of the [l]ease is inapplicable to the determination of the [b]asic [r]ent for the option term."

Interpreting paragraph 3, "both according to its express language, and in light of [plaintiff's] judicial admissions," i.e., that fair market rent be determined by taking into account rent paid by financial institutions, the court ruled that " 'then prevailing rate' refers to the fair market value for comparable bank branch space" as of the date plaintiff's new term began.

To arrive at that number, the court relied on defendant's expert. Although experts for both parties were credible, in calculating the prevailing rate defendant's expert factored in rent for bank branch offices near plaintiff's property, whereas plaintiff's did not. The court determined $3.00 per square foot per month triple net, as proposed by defendant's expert, was the prevailing rate as required under paragraph 3 and entered judgment for that amount.

## DISCUSSION

### 1. *Standard of Review*

The parties devote a substantial amount of their briefs to the proper standard of review. Defendant claims we should use a substantial evidence standard because the court admitted extrinsic evidence as the parties' intent regarding the meaning of the rent provision.

Plaintiff disagrees, asserting the standard is de novo. It relies heavily on the statement of decision, which stated that the court interpreted the lease "as a matter of law." Plaintiff concludes the court did not rely on any extrinsic evidence and therefore we should independently decide the meaning of the lease provision.

We review a trial court's construction of a lease de novo as long as there was no conflicting extrinsic evidence admitted to assist in determining the meaning of the language. (*ASP Properties Group, L.P. v. Fard, Inc.* (2005) 133 Cal.App.4th 1257, 1266–1267 [35 Cal.Rptr.3d 343].) If a lease provision is ambiguous, parol evidence may be admitted as to the parties' intentions if the language is reasonably susceptible to a suggested interpretation. (*Bill Signs Trucking, LLC v. Signs Family Ltd. Partnership* (2007) 157 Cal.App.4th 1515, 1521 [69 Cal.Rptr.3d 589].) If there is conflicting evidence necessitating a determination of credibility, we use the substantial evidence test. (*ASP Properties Group, L.P. v. Fard, Inc., supra,* 133 Cal.App.4th at pp. 1266–1267.)

Here, not only was there no conflicting extrinsic evidence, there was no extrinsic evidence at all as to the intent of the parties about paragraph 3. Defendant points to testimony of the parties' "differing interpretations of the lease." But an interpretation of the lease is not the same as evidence of intent when negotiating or executing the lease, and there was no evidence of the latter. Thus, we construe the meaning of the lease de novo.

### 2. Interpretation of Paragraph 3

■ In interpreting paragraph 3 we "must give effect to the 'mutual intention' of the parties" at the time the lease was executed. (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18 [44 Cal.Rptr.2d 370, 900 P.2d 619].) We look initially to the language of the agreement, seeking its " ' "clear and explicit" meaning' " " 'interpreted in [its] "ordinary and popular sense," unless "used by the parties in a technical sense or [there is] a special meaning . . . [derived from] usage," [citation] . . . .' " (*Ibid.*; see also Civ. Code, §§ 1636, 1638, 1639.) "[L]anguage in a contract must be interpreted as a whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract. [Citation.]" (*Waller v. Truck Ins. Exchange, Inc., supra*, 11 Cal.4th at p. 18.) Construction cannot lead to unfair or absurd results but must be reasonable and fair. (*ASP Properties Group, L.P. v. Fard, Inc., supra*, 133 Cal.App.4th at p. 1269.)

The language at issue in paragraph 3 states: "Such extension shall be subject to the terms and conditions set forth [in the lease], excepting the rent which shall be at the then prevailing rate. However, said rental rate shall not exceed the latest square foot rental paid by the Bank of Irvine or successor in Woodbridge Plaza for ground floor space."

Plaintiff argues the language is not ambiguous but is clear and explicit on its face. It asserts it means that, because Bank of Irvine no longer occupies the premises, plaintiff's new rent can be no more than that of the blended rent of the six tenants now leasing the ground floor space once occupied by Bank of Irvine. It contends that "successor," read in its ordinary sense, means any tenant in the space, not a legal successor in interest as the trial court held. The court's interpretation, it maintains, is too narrow; the term should be construed more broadly.

■ Defendant, on the other hand, supports the interpretation made by the trial court, that successor means successor in interest to Bank of Irvine. Although we ultimately determine neither construction is correct, both are plausible enough in the abstract to support a finding the lease provision is ambiguous. " 'An ambiguity exists when a party can identify an alternative,

semantically reasonable, candidate of meaning of a writing. [Citations.]' " (*Benedek v. PLC Santa Monica* (2002) 104 Cal.App.4th 1351, 1357 [129 Cal.Rptr.2d 197].)

 To give effect to the parties' intent, we may look to evidence of the circumstances surrounding execution of the lease. (Civ. Code, § 1647 ["contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates"]; see also *Nish Noroian Farms v. Agricultural Labor Relations Bd.* (1984) 35 Cal.3d 726, 735 [201 Cal.Rptr. 1, 677 P.2d 1170] [factual context in which agreement reached relevant to establish meaning unless words themselves susceptible to only one interpretation].)

Here those circumstances put the disputed language in context and establish its meaning. Plaintiff and Bank of Irvine, which were competitors, were the two major tenants in Woodbridge Plaza. Their lease terms were concurrent and both paid triple net rent at comparable amounts for plaintiff's premises and Bank of Irvine's ground floor space. Rent for Bank of Irvine's mezzanine used for office space was lower. As Davis testified, rent for ground floor bank premises is generally always more than for second floor space.

This explains the reference in paragraph 3 to "rental paid by the Bank of Irvine or successor . . . for *ground floor space*." (Italics added.) Plaintiff's rent increase was to be tied to comparable rent for bank space, not office space.

Plaintiff strains to construe the italicized phrase "*the latest square foot rental* paid by the Bank of Irvine or successor . . . ." (Italics added.) Its interpretation that its new rent had to be calculated based on a blended rate for all six tenants now occupying the former Bank of Irvine space, while theoretically plausible, is not reasonable or correct given the circumstances under which the lease was executed. Unless the parties anticipated use by a financial institution there would be no point in tying plaintiff's rent to rent for those premises. Because rent for bank premises differs from that for other shopping center space, there would be no reason to limit plaintiff's rent to that for retail and professional tenants merely because those tenants occupied the former Bank of Irvine premises. There was nothing special about that space other than the fact it was being used by a bank.

In addition, if, as plaintiff claims, the purpose of the term was so plaintiff's rent would not be "out of sync with what others in Woodbridge Plaza are paying," a proposition we do not accept, it would have made no sense to limit the cap to tenants in only that part of the center. The language logically would have referred to tenants in the entire center.

The only basis to compare rent between those two premises was because of like use. Plaintiff wanted to remain competitive with Bank of Irvine or a

successor financial institution and did not want its rent to be higher than the other paid. Davis testified that the cap on the increased rent for the extended period was for the benefit of plaintiff so it knew it would not "have to pay more [than Bank of Irvine or a successor financial institution] in the same location for a similar space." Thus, tying rent to the prevailing rent with a cap based on that paid by a competitor was a logical method to calculate rent for plaintiff's extended term.

■ We reject plaintiff's claim that fairness and rules of contract interpretation require us to construe paragraph 3 against defendant. It relies on Civil Code section 1654, which provides, "In cases of uncertainty not removed by the preceding rules, the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist." It contends defendant made the language unclear by subdividing the Bank of Irvine space and leasing it to nonbank tenants without its permission. But this argument has several flaws.

First, because we have resolved the ambiguity by using other aids of interpretation, section 1654 does not apply. Second, this section refers to uncertainty caused by the drafter of the agreement, not by a party's actions after execution of the contract. (See *Masonite Corp. v. Pacific Gas & Electric Co.* (1976) 65 Cal.App.3d 1, 8 [135 Cal.Rptr. 170] [contract construed against "one who caused the ambiguity to exist, i.e., the drafter"].)

Finally, the fact that defendant divided the Bank of Irvine premises does not make our interpretation unfair. There was evidence that defendant tried to re-lease the Bank of Irvine space to another financial institution and when unsuccessful, had no economic choice but to divide the premises, remodel them at considerable cost, and lease to nonbank tenants. The court found that upon the demise of Bank of Irvine, defendant "made commercially reasonable efforts to lease [its] space to another bank or financial institution," and the lease with plaintiff did not prevent it from reconfiguring the space and renting it to other types of tenants. Under the circumstances defendant did what it had to do. This was not unfair to plaintiff.

What would be unfair is to use plaintiff's strained interpretation. Plaintiff's rent had been increasing almost 13 percent every three years. Its proposal to use the rent cap based on a blended rate of all six tenants' rent in the Bank of Irvine space would have decreased the rent from $2.47 to $1.50. Even plaintiff's own expert testified rent in the area was going up and a tenant's rent generally never decreases.

In addition, plaintiff's construction would violate paragraph 6 of the lease, which prohibits a decrease in rent except under limited circumstances that do

not apply here. We need not rely on paragraph 6 for our construction but in any event are not persuaded paragraph 3 would control over it, as plaintiff argues.

The language of paragraph 3 and the circumstances surrounding the execution of the lease convince us the parties intended to tie plaintiff's rent to that of another financial institution, be it Bank of Irvine or another bank taking over its space. Not that it makes any difference in the result, but we do not agree with the trial court that "successor" means a legal successor in interest to Bank of Irvine. Whether the space was occupied by a successor in interest or merely a successor operating a financial institution would not matter to plaintiff in its desire to ensure its rent was not more than a competitor's in the center.

■ "A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting . . . ." (Civ. Code, § 1636.) The parties intended that the rent cap would be based on rent paid by a financial institution occupying the Bank of Irvine premises. There was no intent that it would be tied to the rent of just any other tenant in the space. Because Bank of Irvine was defunct and no financial institution succeeded to its premises, the rent cap in paragraph 3 cannot be used as a factor to calculate plaintiff's new rent. Therefore, according to the remaining portion of paragraph 3, plaintiff's rent must "be at the then prevailing rate."

## 3. *Calculation of Rent*

In determining $3.00 per square foot was the prevailing rate for plaintiff's new rent as called for by paragraph 3, the court considered testimony by both plaintiff's and defendant's experts. It relied on defendant's expert because he had based his number on rents for other financial institutions whereas plaintiff's expert had not. The court also pointed to plaintiff's admission in its verified complaint that the fair market rent was to be calculated based on rent paid by a tenant operating a bank or a similar use.

There is substantial evidence to support the court's determination of rent. And plaintiff does not challenge the factual basis for the decision. It merely argues the court should have calculated the rent based on the rent cap, which we have held is not the correct construction of paragraph 3.

## DISPOSITION

The judgment is affirmed. Respondent is entitled to costs on appeal. Pursuant to the lease, respondent is also entitled to attorney fees on appeal, to be determined by the trial court.

O'Leary, J., and Moore, J., concurred.