Filed 5/13/14  Sema Construction v. City of Tustin CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FOURTH APPELLATE DISTRICT

### DIVISION THREE

| | |
|---|---|
| SEMA CONSTRUCTION, INC., | |
| Plaintiff and Appellant, | G046874 |
| v. | (Super. Ct. No. 30-2008-00101147) |
| CITY OF TUSTIN, | O P I N I O N |
| Defendant and Respondent. | |

Appeal from a judgment of the Superior Court of Orange County, Kim Garlin Dunning, Judge.  Affirmed.

Musick, Peeler & Garrett and Jack W. Fleming; Snell & Wilmer, Richard A. Derevan and Todd E. Lundell for Plaintiff and Appellant.

Woodruff, Spradlin & Smart, M. Lois Bobak, Joseph W. Forbath and Magdalena Lona-Wiant for Defendant and Respondent.

\*          \*          \*

Plaintiff SEMA Construction, Inc. (SEMA) appeals from a judgment awarding it $486,555 in compensatory damages plus prejudgment interest against defendant City of Tustin (Tustin) in an action for breach of a public works contract. The judgment is based on Tustin's underpayment for SEMA's disposal of groundwater from a construction site. SEMA contends the trial court erred in limiting its recovery, arguing the terms of the parties' contract and their conduct before any dispute arose entitled it to a much larger award. Finding no error, we affirm the judgment.

## FACTS AND PROCEDURAL BACKGROUND

*1. Background*

SEMA was the successful bidder on a $23.8 million contract to build roads on property within an area previously used by the United States Marine Corp. as a helicopter base. The area is referred to as the Tustin Legacy project. The work included "construction of sanitary sewers, storm drains, reclaimed water lines, [and] domestic water lines." Irvine Ranch Water District (IRWD) was the entity that would take over operation of the completed pipelines and it entered into a contract with Tustin to reimburse it for certain construction related expenses.

The contract consisted of six lettered sections and two appendices. Sections A and B covered Tustin's notice to contractors of the project, plus blank contractor bid forms. Section C was the contract agreement containing SEMA's successful bids for each item of work to be performed, its performance and labor and material bonds, and insurance certificate. Section D contained the contract's general provisions. Sections E and EH covered special contract terms. The latter part, section EH, dealt with construction work in a portion of the project known to have soil contamination and described as the Area of Institutional Control (AIC). In part, the

2

contract required SEMA to obtain and bear the cost of "all permits . . . for this project" and to "comply with all rules and regulations included in [the] permits."

The contract's general provisions also incorporated the most recent edition of the Standard Specifications for Public Works (i.e., "Greenbook") and declared the Greenbook "will control . . . except as amended by the plans, these special provisions, or other contract documents." The Greenbook provides that "[n]ew or unforeseen work will be classified as 'extra work' when the Engineer determines that it is not covered by Contract Unit Prices or stipulated unit prices." In the event "extra work is deemed necessary, the scope of the work shall be documented under the terms and conditions of the City['s] . . . Contract Change Order form . . . ."

The portion of the agreement that covered installing drains and water lines required SEMA to remove groundwater seeping into the trenches during construction, a process known as dewatering. Payment for the cost of dewatering was covered in two separate contract sections. Under section C, SEMA agreed to receive a lump sum of $380,700 for sheeting, shoring, bracing and dewatering the sewer, storm, and water trenches. Section E-21 stated "the lump sum contract price[]" for this work "shall be considered full compensation . . . and no additional compensation will be allowed."

Section EH required SEMA to perform groundwater sampling in the AIC. Additive Bid Item A4, covering the treatment of contaminated liquids, specified "contaminated groundwater generated during dewatering activities, . . . be treated, if required by permit" through "a granular activated carbon (GAC) treatment system" before being "disposed into a sanitary sewer or off-site wastewater treatment facility." SEMA was also directed to "obtain and pay for any permit required for disposal to the . . . sewer system from [IRWD]."

The contract authorized SEMA to receive "payment for the actual quantities [treated] . . . multiplied by the unit price[] stated," but specified the "[d]etermination[] of the actual quantities . . . will be made by the [City] Engineer,"

3

which after "review with the Contractor . . . will be final and binding." SEMA agreed to charge a fixed unit price of 16 cents per gallon for this work. Tustin's request for bids estimated the amount of contaminated liquids requiring GAC treatment at 500,000 gallons, but warned this figure was "approximate only."

In its April 2005 notice to proceed with the work, Tustin informed SEMA it had retained Washington Group International, Inc. (WGI) to administer the project and Arturo Diaz, WGI's resident engineer, was the construction manager. SEMA was told to direct "[a]ll official correspondence and billing" to Diaz.

After SEMA was awarded the contract, the parties learned IRWD either would not or could not allow the discharge of groundwater into its system. It was then decided to obtain a discharge permit from the Orange County Sanitation District (OCSD) and dispose of the groundwater through its facilities. OCSD required the permit application to be filed by Tustin. In addition, it agreed to issue the permit only if SEMA treated *all* groundwater removed from the *entire* project site through dewatering with the GAC process before discharging it into the sewer system. SEMA informed Diaz it expected to be paid for the treatment of all groundwater at the Bid Item A4 unit price.

On September 2, 2005, Diaz sent SEMA a letter stating he would issue a contract change order (CCO 19) to use the Bid Item A4 method of payment for the treatment of liquids "processed through the treatment facility and disposed to the [s]ewer [s]ystem." OCSD issued its permit four days later and Diaz issued CCO 19 the same day. However, CCO 19 listed the price adjustment as "0.00." At trial Diaz testified, "This change order was just for modification to allow payment of hazardous and nonhazardous water, in that at that time it was not anticipated [the quantity treated] w[ould] exceed the quantity allowed in the contract . . . ."

By September 20 SEMA had discharged 880,000 gallons of GAC treated groundwater through OCSD's system. SEMA submitted an invoice to Tustin requesting payment for this work at the Bid Item A4 unit price. Tustin paid the invoice. However,

4

by October 4, SEMA had treated and discharged approximately 2.5 million gallons of groundwater.

On September 26, a meeting was held between Diaz and city officials about the need to renegotiate the cost for the dewatering process. The next day, Diaz issued another contract change order (CCO 2). It stated, in part, "Quantity beyond 125% of the original Bid Item [A4] (i.e. 625,000 Gallons) will be subject to adjustment" under the Greenbook's provisions governing changes in work initiated by a contracting agency.

Under section 3-2.2.1 of the Greenbook, where "a change is ordered in an item of work covered by a Contract Unit Price . . . [not] involv[ing] a substantial change in character of the work," an adjustment in payment "will be based upon the increase or decrease in quantity and the Contract Unit Price." But "[a]djustments in excess of 25 percent [of the total cost of a bid item] may be done by [either] extension of Contract Unit Prices as described above, or pursuant to 3-2.2.3." The latter provision states "[a]djustments in payment for changes . . . will be determined by agreement between Contractor and Agency" and, if they are "unable to reach agreement, the Agency may direct the Contractor to proceed on the basis of Extra Work in accordance with 3-3," which authorizes a contractor to be paid on a time and materials, plus markup basis through the use of "daily report[s] . . . listing all labor, materials, and equipment involved for that day . . . ."

On October 6, SEMA sent WGI and Diaz a letter declining to sign either CCO 19 or CCO 2. As for CCO 19, SEMA noted it "was poorly drafted in that it did not have quantities, cost, or adjustment of time." SEMA refused to sign CCO 2 because "as drafted . . . it changed the specifications retroactively while the work is progressing on an item of work." The letter then stated: "A meter reading will be taken by the end of business day on October 6, 2005 and the City must pay SEMA for such quantity according to the existing specifications. After October 6 . . . the item will be paid with adjustment upon the City drafting a new CCO to reflect that."

5

Diaz responded to SEMA's October 6 correspondence a few weeks later. He summarized some relevant contract terms and events concerning the dewatering issue and stated as follows: "It was never envisioned that water outside of the [AIC] would require filtration prior to discharge. However, the permit issued by the OCSD requires that all groundwater be filtered . . . . Initially, as a convenience, the City chose to utilize an existing bid item (A4) for this new work. As it is now obvious that the quantity of water to be discharged . . . far exceeds the original estimated units . . ., it is appropriate that an adjustment be made for payment for the work. [¶] [T]he City suggests . . . that payment under Bid Item Number A4 be fixed at 500 units [per 1,000 gallons] at the price bid. Thereafter, any additional costs incurred as a result of additional work performed by SEMA would be reimbursed on either a Time and Materials basis, or on a unit price basis if such unit price is agreeable between the parties."

The letter gave SEMA until October 31 to respond "regarding which method of payment i[t] preferred," which was later extended to November 4. Diaz also requested SEMA provide documentation on "costs to date" and its "calculation of cost . . . on a unit price basis for the first 500 units, as well as subsequent units" and warned "[i]f SEMA fails to provide the requested information," "the City will issue a unilateral Change Order . . . setting forth the method of payment and corresponding rates. SEMA may pursue the applicable remedies provided under the contract, if it disagrees with the City's decisions."

In a November 1 letter to WGI and Diaz, SEMA's project manager stated in part: "October 6 . . . is the date which SEMA . . . received WGI's CCO 2 changing bid item A4 to be subject to the 125% adjustment clause. It is SEMA's position that we should be paid at the bid item price for water treated through October 6 . . . . However, we understand that this pay request . . . does not reflect what the City intends to pay under bid item A4. We understand that the City will not continue to pay for water treated at bid item price beyond what has been paid to date . . . ." Diaz answered SEMA's

6

correspondence on November 11, reiterating Tustin's request for documentation concerning the "costs to date" and "calculation of cost" for "subsequent units." He also stated, "The City still believes it is important for both parties to resolve this matter as soon as possible to mitigate future claims."

SEMA's project manager finally responded to Diaz's October 21 correspondence on November 14. He disagreed "with [Diaz's] summary of what transpired in some of the meetings," and noted "[u]pon . . . receiving draft CCO 2 and recognizing that the City elected to adjust the bid price, SEMA was willing to accept a price adjustment to the bid item but did not agree with the retroactive effect that CCO 2 had. [¶] SEMA is committed to working with the City in resolving this issue . . . ."

The parties never reached an agreement on the amount owed to SEMA for its dewatering and SEMA did not provide Tustin with the requested time and materials cost information. But the trial court found relevant the following portion of a November 29 letter a Tustin engineering services manager sent to an IRWD project manager.

That letter stated in relevant part as follows: "From the onset of the . . . excavation activities for the . . . sewer mainline . . ., the project has had issues with the proper handling and disposal of groundwater. . . . Moreover, . . . the [OCSD] required that ALL groundwater being discharged to the sewer would require treatment utilizing a [GAC] filter. At the time the contract was bid, it was anticipated that the only treatment required would be in the AIC. [¶] As the contractor's operations were in suspension due to the dewatering issues, the City made the determination that all water should be treated and pumped into the OCSD sewer facility . . . . As a result of the changed conditions for discharge (i.e. the requirement for GAC treatment), and to preclude further delays to the contractor . . . [t]he city directed the contractor to utilize the existing bid item for treated water (Bid Item A4) for all water discharged into the OCSD facilities. [¶] As this is clearly a change of condition, we have requested the contractor provide information regarding [its] incurred costs for treating the additional volume of

7

water. It is our intention to pay the bid price for treated water up to the engineer's estimated quantity and negotiate a price for the additional quantity of water treated."

The resolution of the dewatering price issue was further complicated by leaks from manhole pipes and covers installed by a SEMA subcontractor named Precon. SEMA eventually determined Precon was responsible for the leaks and reached a settlement with it. Tyler Faulkner, SEMA's project manager, sent an e-mail to Azzam Saad, its contracts manager, in August 2006 stating the "dewatering for repairs . . . is in the range of 20 million gallons in the past 7-8 months." At trial, Faulkner stated on direct examination, this estimate "was kind of an out-of-the-hat number . . . to scare Precon." When cross-examined, he acknowledged he reviewed the project's file before sending the e-mail and "intended to provide Mr. Saad with accurate information." In addition, Tustin impeached Faulkner with testimony from his deposition where he also admitted using the project file to make the estimate rather than picking a number "out of thin air."

During the course of the project, SEMA treated over 36.5 million gallons of groundwater that was discharged into OCSD's sewers.

2. *The Litigation*

SEMA sued Tustin seeking over $5.8 million in compensatory damages. In turn, Tustin filed a cross-complaint for indemnity against IRWD. Initially, the parties agreed to try the case in two phases, the first based on the complaint.

At the end of phase one, the trial court issued a 15-page statement of decision explaining the basis of its decision on three issues. First, the court rejected SEMA's claim it was entitled to be paid at the rate of $.16 for each gallon of liquid it treated through the dewatering process. The court stated, "Bid Item A4 was intended to apply only to the pre-disposal treatment of contaminated groundwater in the [AIC]," and "OCSD['s] permit requirement for the treatment of all groundwater before disposal did not expand the reach of . . . Bid Item A4 . . . ." It also found "no credible evidence, from

8

[SEMA's] expert . . . or otherwise, to support a reliable calculation as to the amount of groundwater extracted and treated from areas inside the AIC, compared to areas out the AIC."

Second, the court held Tustin was not financially obligated to pay for all of the groundwater SEMA treated. It credited SEMA's own expert's admission on cross-examination that "the treatment and dewatering that occurred when SEMA was repairing faulty work should not be charged to [Tustin]." But the court rejected this witness' estimate that the repairs caused only 7.4 million gallons of additional groundwater, noting he acknowledged "no expert could review these records after the fact and accurately estimate" the amount of "treated groundwater . . . attributable to [the] repair work." In contrast, the court found Faulkner's original e-mail estimate "credible and reliable," citing his "testimony . . ., including those portions of impeachment testimony read from his deposition." Thus, it found "the total number of gallons of groundwater treated per the requirements of the OCSD permit and potentially properly chargeable to [Tustin] to be 36.5 million gallons less 20 million gallons, for a total of 16.5 million gallons."

Finally, the court found Tustin owed SEMA additional sums for the treatment of groundwater, but limited the recovery to the groundwater treated through October 6, 2005. The court held Tustin was "bound by Mr. Diaz's September 2, 2005 letter . . . concerning the . . . interim agreement to pay . . . Bid Item A4's Contract Unit Price to treat groundwater outside the AIC," which Tustin "ratified . . . in its November 29, 2005 letter to IRWD." However, it concluded "the decision to initially use . . . Bid Item A4 to temporarily cover the costs of treating all groundwater was a convenience to keep the project moving" and "did not constitute a modification of the terms of . . . [the] A4 Bid Item" other than "to allow the use of already-budgeted contract funds for a limited time to deal with the OCSD's unanticipated permit requirement."

Citing the "written exchange[s] . . . in the September – November 2005 time frame," the court found "both parties understood [Tustin] was obligated to pay

9

[SEMA] at the . . . Bid Item A4 rate . . . for all water treated through . . . October 6, 2005." The parties stipulated SEMA treated 3,920,970 gallons of groundwater through October 6, 880,000 of which Tustin had already paid SEMA at the rate of $.16 per gallon. That left an unpaid balance of 3,040,970 gallons and, at the $.16 per gallon rate, Tustin owed SEMA $465,555.

The court then addressed SEMA's entitlement to be paid for the remaining balance of 12,579,030 gallons of groundwater it had treated. In doing so, the court applied the provisions of the Greenbook. It held the amount SEMA would be entitled to receive was governed by sections 3-2.2.3 and 3-3. Section 3-2.2.3 states in relevant part, "[a]djustments in payments for changes . . . will be determined by agreement between Contractor and Agency," or "[i]f [they are] unable to reach agreement, the Agency may direct the Contractor to proceed on the basis of Extra Work in accordance with 3-3." As noted above, section 3-3 authorizes payment for work on a time and materials plus markup basis.

In support of this conclusion, the court found: (1) OCSD's permit "requirement to pre-treat all groundwater before disposal, whether or not tested for contamination and everywhere on the site, within and beyond the AIC" constituted both "'change initiated by the agency'" and "'involve[d] a substantial change in character of the work from that shown on the Plans or included in the Specifications' for a Contract Unit Price item"; and (2) given the "undisputed evidence that the total cost for the new work was more than 33 times the original estimate," "[t]he additional groundwater treatment far exceeded 25% of the total cost of such treatment . . . ." Referring to Diaz's October 21, 2005 letter to SEMA, the court further found Tustin "acted under section 3-3 when it asked SEMA to furnish 'time and material' calculations and other pertinent cost information," but noted "the evidence was undisputed that SEMA never complied with [Tustin's] request . . . ."

10

The court agreed SEMA's failure to provide documentation of its costs to Tustin during construction did not preclude its recovery at trial. But, citing SEMA's "deliberate decision in the litigation not to offer any 'time and materials plus markup' evidence at trial, . . . despite several exchanges with the court and opposing counsel on this very issue," the court declined to award any amount because "there [wa]s no evidence in the form of daily reports" or other "competent evidence in the trial record upon which to make such an award." Rather, since SEMA "chose to rely on the legal argument as a matter of contract interpretation that it was entitled to $.16 per gallon for all groundwater treatment during construction," the court held SEMA "knowingly waived the right to collect time and materials plus markup payments for the 12,579,030 . . . gallons of dewatering water treated after October 6, 2005."

After the court entered judgment on the complaint, Tustin dismissed its cross-complaint against IRWD.

DISCUSSION

*1. Introduction*

The following legal principles apply in this case. The rules of contract interpretation generally governing contracts between private parties apply to the public works contract at issue here. (*P&D Consultants, Inc. v. City of Carlsbad* (2010) 190 Cal.App.4th 1332, 1340; Civ. Code, § 1635.) "'[T]he primary object of all interpretation is to ascertain and carry out the intention of the parties'" (*City of Manhattan Beach v. Superior Court* (1996) 13 Cal.4th 232, 238) "as it existed at the time of contracting . . . ." (Civ. Code, § 1636.) "'All the rules of interpretation must be considered and each given its proper weight, where necessary, in order to arrive at the true effect of the instrument.'" (*City of Manhattan Beach v. Superior Court, supra,* 13 Cal.4th at p. 238.) "'[L]anguage in a contract must be interpreted as a whole, and in the

11

circumstances of the case,'" and "[c]onstruction cannot lead to unfair or absurd results but must be reasonable and fair." (*California National Bank v. Woodbridge Plaza LLC* (2008) 164 Cal.App.4th 137, 143.)

As a general rule, "'"[A]n appellate court is not bound by a construction of the contract based solely upon the terms of the written instrument without the aid of evidence [citations], where there is no conflict in the evidence [citations], or a determination has been made upon incompetent evidence [citation]."'" (*City of Manhattan Beach v. Superior Court, supra,* 13 Cal.4th at p. 238; see also *Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865-866.) But "[o]n an appeal challenging the interpretation given to a writing, . . . the substantial evidence rule will apply in cases where the parties present conflicting extrinsic evidence to aid in the interpretation." (*Burch v. Premier Homes, LLC* (2011) 199 Cal.App.4th 730, 742.) In this circumstance, "we examine the evidence in the light most favorable to the prevailing party and give that party the benefit of every reasonable inference. We accept all evidence favorable to the prevailing party as true and discard contrary evidence. We do not reweigh the evidence or reconsider credibility determinations." (*Katsura v. City of San Buenaventura* (2007) 155 Cal.App.4th 104, 107.)

*2. Analysis*

SEMA attacks the trial court's decision on several grounds. We find all of its contentions lack merit.

First, SEMA claims the court erred in construing the contract to mean its right to recover $.16 per gallon for treatment of groundwater was limited to the area covered by the AIC. It argues the terms of the contract do not limit Bid Item A4 to that area, noting it was required to create an environmental work plan for the project that included a contingency plan for contaminated materials discovered outside of the AIC and that the engineer had authority to apply the requirements of section EH if

12

contaminated materials were discovered elsewhere. In addition, SEMA focuses on the fact the contract obligated it to obtain all required permits and to comply with the requirements imposed by them.

What SEMA ignores is the fact Bid Item A4 related only to the treatment of groundwater and other liquids found to be *contaminated*. Contrary to its interpretation of the contract, SEMA was not automatically entitled to charge $.16 per gallon for all groundwater disposed from the AIC or anywhere else within the project site. Rather, the contract acknowledged the AIC was an area where contaminants in the soil and groundwater were known to exist. The contract contained provisions requiring SEMA to conduct testing for the presence of contaminants within the AIC as well as a contingency plan in the event contaminants were discovered elsewhere in the project site. But in each case, SEMA was entitled to charge the Bid Item A4 price only for its treatment of *contaminated* material.

SEMA places great emphasis on the fact the contract obligated it to obtain and adhere to the requirements of permits, including permits for the discharge of groundwater and that OCSD's permit directed it to treat all groundwater. But as noted, we must construe the contract "as to give effect to the mutual intention of the parties as it existed at the time of contracting." (Civ. Code, § 1636.) SEMA acknowledges in its opening brief, and the parties stipulated at trial, that IRWD was involved in the project to install sewers and pipelines in the Tustin Legacy site and had even agreed to reimburse Tustin for part of the expense to do this work. The portion of the contract applying to "[c]ontaminated liquids . . . generated during dewatering activities," expressly stated SEMA "shall obtain and pay for any permit required for disposal to the sanitary sewer system from [IRWD]." Thus, it is reasonable to assume that when the parties entered into the contract they both understood IRWD would issue a permit requiring only *contaminated* groundwater or other liquids be subjected to the more expensive GAC treatment before discharge.

13

This assumption went out the window when IRWD backed out of allowing the use of its facilities to dispose of groundwater and other liquids. The permit obtained from OCSD several months later substantially altered the handling of groundwater during the dewatering process. OCSD insisted *all* groundwater from the entire project site, contaminated or not, be subjected to the GAC treatment process before being discharged into its sewer system. The mere fact that OCSD's permit required GAC treatment for all groundwater did not magically extend the Bid Item A4 unit price, which by its terms only applied to contaminated water encountered in one section of the project site, to the discharge of all groundwater.

SEMA alternatively argues Diaz authorized it to charge $.16 per gallon for its treatment of all groundwater in his September 2, 2005 letter. But the trial court found this authorization, which Tustin ratified, was only an interim decision to avoid further delays in completing the project. SEMA disputes this conclusion, but the issue presents a credibility question and we defer to the trial court's findings on it. (*Nestle v. Santa Monica* (1972) 6 Cal.3d 920, 925.) Further, even SEMA's own correspondence recognized Diaz's September 2 authorization was not set in stone. It acknowledged Tustin's right to adjust the compensation owed to it for treating all groundwater, but only objected to the city's attempt to do so after the fact. SEMA's project manager explained in his October 6 letter that he refused to sign CCO 2 because "as drafted . . . it changed the specifications *retroactively* while the work is progressing on an item of work." (Italics added.) Again, on November 14, the project manager wrote to Diaz stating, "Upon . . . receiving draft CCO 2 and recognizing that the City elected to adjust the bid price, SEMA was willing accept a price adjustment to the bid item but did not agree with the *retroactive effect* that CCO 2 had." (Italics added.) The trial court found in SEMA's favor on this point, awarding it recovery at the unit price for all groundwater it treated through October 6, 2005.

14

Next, SEMA attacks the trial court's 20 million gallon reduction in the amount of groundwater subject to compensation due to its subcontractor's faulty work. It relies on Faulkner's direct examination testimony deriding his 20 million gallon e-mail estimate as "an out-of-the-hat number . . . to scare Precon." But the trial court relied on not only that e-mail, which Faulkner sent to a co-employee and not Precon, but his admissions during cross-examination, plus the impeachment of his testimony with a contrary statement from his deposition. We conclude the record supports the trial court's resolution of this disputed issue. (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881 ["'When a finding of fact is attacked on the ground that there is not any substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether there is any substantial evidence contradicted or uncontradicted which will support the finding of fact'"].) Merely because there was contrary evidence rejected by the trial court does not justify a reversal of this finding.

As the trial court found OCSD's permit requirement concerning the handling of groundwater discharged into its sewers amounted to a substantial change in the character of the work contemplated by the parties when they entered into the contract. Since the evidence established the parties never reached an agreement on compensation for the groundwater treated after October 6, 2005, the court invoked the terms of the Greenbook to determine SEMA was entitled to compensation for its treatment of the balance of the groundwater on a time and materials plus markup basis. However, due to SEMA's tactical choice to stand on its $.16 per gallon claim and refusal to present evidence justifying an award for time and materials, plus markup, the court declined to award anything to it.

SEMA's final contention challenges this ruling, arguing the contract excluded the use of "the Greenbook's safety valve" to allow for adjustment of the unit price for a deviation in the quantity of contaminated material from Tustin's original estimate. Its interpretation misconstrues the parties' contract. First, the contract

expressly declared the Greenbook's provisions applied "except as amended by the plans, the[] special provisions, or other contract documents." Second, the clause on which SEMA relies only precluded the "[a]djustment of unit prices for [the] Additive Bid Item[s]" where it resulted "due to a variation from the estimated quantities . . . ." By its terms, this clause was limited to variations in the amount of *contaminated* materials included within the Additive Bid Items. Here, as the trial court found, OCSD's requirement that all groundwater, contaminated or not, be treated with the GAC process, thereby resulting in a 33-fold increase in the volume of treated groundwater, constituted a substantial change in the character of the work, not merely a variation in the quantity of contaminated liquids requiring treatment before discharge.

## DISPOSITION

The judgment is affirmed. Respondent shall be entitled to its costs on appeal.


RYLAARSDAM, ACTING P. J.

WE CONCUR:


ARONSON, J.


FYBEL, J.

16