Filed 10/24/24  Paulos v. Paulos CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| NICHOLAS PAULOS, et al., | B331229 |
| Plaintiffs and Respondents, | (Los Angeles County Super. Ct. No. 22STPB03448) |
| v. | |
| ALEXANDER ANTHONY PAULOS, as Trustee, etc., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Daniel Juárez, Judge.  Affirmed.

Sheppard, Mullin, Richter & Hampton, Adam F. Streisand, Golnaz Yazdchi, Valerie E. Alter and Tomasene A. Knight for Defendant and Appellant.

Sacks, Glazier, Franklin & Lodise, Margaret G. Lodise and Antonieta Pimienta Lefebvre for Plaintiff and Respondent Nicholas Paulos.

The Rubin Law Firm and Brett M. Rubin for Plaintiff and Respondent Thomas Paulos.

\* \* \* \* \* \*

After a wealthy family's patriarch died and the named trustee had yet to distribute the trust after two years, the trial court granted the requests of two beneficiaries to name them as trustees over interim trusts covering their anticipated shares of the trust's assets pending final distribution of the estate. The named trustee challenges this order. We reject this challenge and affirm.

## FACTS AND PROCEDURAL BACKGROUND

### I. The Family

During his lifetime, Fred Paulos (Fred) had seven children with three wives.[1] Three of those children are Alexander, Nicholas and Thomas.[2]

---

[1] One of those children was the child of Fred's first wife and another man, but Fred treated her as one of his natural children.

[2] Because these individuals share the same last name, we will use first names for clarity's sake. We mean no disrespect.

2

Fred and his third wife, Lulah Lipop Paulos, who goes by the name "Poppy" and is the mother of Alexander and Nicholas, had entered into a prenuptial agreement back in 1977.

## II. The Operative Trust

On January 16, 2003, Fred created a living trust to govern his assets. The operative version of this trust is the Third Amendment to and Complete Restatement of Declaration of Trust of the Fred Paulos Living Trust, signed May 11, 2018 (the trust). In general terms and as pertinent here, the trust provides for the disposition of Fred's assets upon his death as follows: First, Poppy is to receive (1) all "Tangible Personal Property," (2) $50,000 cash, pursuant to the prenuptial agreement, (3) a parcel of real property located on Lexington Avenue in Los Angeles, and (4) Fred's community property interest in four parcels of real property located in Beverly Hills or West Hollywood. Second, Fred's seven children are to receive equal shares of the trust's remaining assets (that is, the assets remaining after the distribution of Poppy's share and the payment of any debts, expenses, and taxes owed by the trust); each share is to be "distributed outright and free of trust." However, if any of these children predeceases Fred, the trust authorizes the creation of a "separate trust" for any "descendant of [that] deceased child" of Fred. The distribution of the trust's assets upon Fred's death is to be overseen by two successor trustees—namely, Fred's son Alexander and a family friend who happens to be a judge on the Los Angeles Superior Court.

## III. Fred's Death

Fred died on December 12, 2020. At that time, the trust's assets exceeded $50 million in value, most of which was tied up in 11 parcels of real property.

3

Consistent with the trust's terms, Alexander and the judge were named as successor trustees of the trust.

## IV. Nicholas's and Thomas's Petitions

When the successor co-trustees had yet to distribute the trust's assets nearly 18 months after Fred's death, Nicholas and Thomas (the brothers) filed verified petitions asking the probate court for orders (1) requiring the co-trustees to perform an accounting of the trust's assets; (2) creating separate trusts for the brothers covering their anticipated shares of the trust's assets, declaring the brothers to "serve as sole Trustee" of their respective separate trusts, and ordering the co-trustees to "immediately turn over the assets vested in [each brother], as successor trustee of his share of the Trust without further compensation paid to the Co-Trustees"; and (3) compelling distribution of the trust's assets.

Alexander—as the sole remaining successor trustee[3]—opposed the petitions despite admitting the long delay in administering the trust.

The probate court convened a hearing on April 10, 2023. Although this hearing occurred over two years after Fred's death, Alexander had yet to distribute the trust's assets. At that hearing, he conceded that the brothers would "be able to serve as trustees of their own trust[s]," but asked the court not to appoint them as successor trustees until all of the siblings "work[ed] through issues of creating liquidity" in the trust's assets.

The probate court issued an oral ruling (1) ordering an accounting due in late June 2023, (2) denying outright

_____

[3] Nicholas and Thomas had also petitioned to remove the sitting judge as a co-trustee, and he later resigned due to this pending litigation before the court of which he was a member.

4

distribution of the trust's assets, and (3) naming Nicholas and Thomas as "successor trustees for their share."

## V. Post-Order Challenges

After the probate court's oral ruling and prior to its issuance of a written order, Alexander filed a post-ruling "opposition" as to each brother's petition. He argued for the first time that the probate court lacked the authority to name Nicholas and Thomas as successor trustees of their shares of the trust during the pendency of the trust's protracted administration. In support of his opposition, Alexander submitted a declaration from the attorney who drafted the trust; the attorney declared that the probate court's order was "unintelligible" because both the attorney and Fred intended that Fred's children each receive their distributions "outright" rather than in trusts.

The probate court thereafter issued written orders that ordered Alexander "to turn over to [Nicholas and Thomas], as successor trustee of [his respective] share, all of the assets of [his] share, as [each brother] is now over 40 years old."[4]

## VI. New Trial Motions

Alexander thereafter filed two motions for new trial, one for each brother-specific order. After a full round of briefing, Alexander withdrew his motion as to Nicholas, and the probate court denied the motion as to Thomas. In the order regarding the motion as to Thomas, the court ruled that (1) a new trial motion was procedurally improper because the "matter is far from completed," and (2) Alexander's challenges lacked merit because

---

4 The order originally issued for Nicholas omitted this language, and was corrected nunc pro tunc after extensive briefing by the parties.

the court's creation of interim trusts for the brothers was "consistent with the terms of the trust" and because Alexander "fail[ed] to identify a term that prohibits the creation and funding of separate trusts with distributed assets."

**VII. Appeal**

Alexander filed a timely notice of appeal from the orders appointing Nicholas and Thomas as successor trustees of their respective separate trusts.  (Prob. Code, §§ 17200, subd. (b)(1), 1304, subd. (a)).[5]

## DISCUSSION

Alexander argues that the probate court issued invalid orders because the trust requires its assets to be distributed to Fred's children "outright and free of trust," such that the orders directing Alexander to "turn over" Nicholas's and Thomas's shares of the assets "in trust" is unauthorized.  Nicholas and Thomas respond that (1) the probate court did not *distribute* the assets but instead created separate interim trusts for each to control during the remaining time it takes Alexander to distribute the trust's assets, and (2) the trust authorizes the creation of such interim, separate trusts.  Because these arguments are effectively ships passing in the night, this appeal presents two questions:  First, what do the probate court's orders *do*?  And second, are those orders authorized by the terms of the trust?  Because these questions require us to examine the language of the court's orders as well as the language of the trust, they present questions of law we review de novo.  (*Johnson v. Greenelsh* (2009) 47 Cal.4th 598, 604.)  We accordingly focus on the propriety of the probate court's *ruling* rather than the

---

[5]     All further statutory references are to the Probate Code unless otherwise indicated.

6

correctness of its reasoning. (*Tsasu LLC v. U.S. Bank Trust, N.A.* (2021) 62 Cal.App.5th 704, 715.)

## I. The Probate Court Created Separate, Interim Trusts

The parties proffer two different readings of the probate court's orders: Alexander insists that the orders require him to *distribute* the trust's assets to Nicholas and Thomas "in trust," while the brothers maintain that the orders merely create a separate trust covering each brother's share of the trust's assets during the interim period until the trust is distributed, names them as the successor trustee of each respective separate trust, and orders Alexander to "turn over" the pertinent share of trust assets to those separate trusts.

We conclude that the brothers' reading of the probate court's orders is the better reading, and do so for two reasons. First, it is the reading most consistent with the context of the litigation. Each brother petitioned for, as pertinent here, *two* orders—namely, (1) an order creating a separate trust over their own share of the trust's assets and naming them as the successor trustee of that trust, and (2) an order compelling final distribution of the trust's assets. The probate court only granted the first order when it named each brother a "successor trustee[] for [his] share." Further, "distribution" is defined by probate law generally and by the trust in this case as what happens *after* the payment of Poppy's share, trust debts and expenses, and trust taxes (e.g., *Estate of Ziegler* (2010) 187 Cal.App.4th 1357, 1365 ["'Distribution,' when used as a term of art in probate law, means 'the process of dividing an estate *after* realizing its movable assets and paying out of them its debts and other claims against the estate'"]; cf. *ibid.* [using different definition of "distribution" for statute of limitations purposes under Code of Civil Procedure

7

section 366.3]), yet it appears that at least some of these other expenses (namely, certain taxes) were pending payment while the brothers' petitions were litigated; thus, timing-wise, the court's orders were *not* orders distributing the trust's assets. Second, the court's orders at a minimum could reasonably be read to create interim separate trusts, such that any ambiguity should be resolved in favor of that reading because that reading, as discussed below, would render the court's orders valid. (*In re Marriage of Falcone & Fyke* (2012) 203 Cal.App.4th 964, 989 [when a court order "is susceptible 'to two interpretations, the [appellate] court should give the construction that will make the [writing] lawful, operative, definite, reasonable and capable of being carried into effect . . .'"].)

In response, Alexander asserts that the probate court's written orders require him to "turn over" assets and that "[t]his language, by definition, constitutes a distribution order." He is wrong. A separate trust has to be funded, so the court's directive for Alexander to "turn over . . . all of the assets of [each brother's] share" is incidental to the creation of each separate trust. For the reasons set forth above, the broader context of the court's orders indicates that the court was merely funding each brother's separate trust. Although the probate court's order denying the new trial motion refers to Alexander's failure to "identify a term that prohibits the creation and funding of separate trusts with *distributed* assets" (rather than "assets *to be distributed*") (italics added), this linguistic choice—even if we deem it a misstep—does not undermine the contextual evidence we otherwise find persuasive.[6]

---

[6] In light of our reading of the probate court's orders, we have no occasion to address Alexander's arguments that the trust

## II. The Trust Authorizes a Probate Court to Create a Separate Interim Trust

Probate courts are authorized to issue orders resolving petitions as long as those orders are consistent with the language of a trust and consistent with the Probate Code. (§ 17206; see also *Christie v. Kimball* (2012) 202 Cal.App.4th 1407, 1413; *Schwartz v. Labow* (2008) 164 Cal.App.4th 417, 427.) In construing a trust, we are guided by the testator's intent (§ 21102, subd. (a); *Crook v. Contreras* (2002) 95 Cal.App.4th 1194, 1206), which is derived most directly from the language of the trust document itself (*Städel Art Museum v. Mulvihill* (2023) 96 Cal.App.5th 283, 293).

### A. *Analysis*

The probate court's orders creating interim separate trusts funded by the trust assets to which Nicholas and Thomas would be entitled shares upon distribution—during the pendency of the protracted administration of the trust—was authorized by the trust itself. Paragraph 5.1.26 of the trust grants "[t]he Trustee" the "discretionary authority to . . . separate a single trust into one or more separate trusts" after considering a variety of factors, including "efficiencies of administration, generation-skipping and other transfer tax considerations, income tax factors affecting the various trusts and their beneficiaries, present and future financial and other objectives of the trusts and beneficiaries, the need or desirability of having the same or different Trustees for various trusts or shares, and any other considerations the

---

does not authorize an order effectuating a *distribution* into separate trusts.

9

Trustee may deem appropriate to those decisions."**7**  What is more, paragraph 2.3 provides that "if after [Fred's] death a separate trust is established under this instrument for the primary benefit of any descendant of [Fred], then upon attaining the age of forty (40) years, each descendant shall serve as sole Trustee of his or her trust."  Together, these provisions authorize the trustee—and, by extension, the probate court when presented with a petition seeking to invoke these provisions—the power to (1) create a separate trust for "*any* descendant" of Fred's prior to distribution of the estate (since any *distribution* must be "free of trust"), and (2) name that descendant as the sole trustee of that separate trust if the descendant is over the age of 40 (as both Nicholas and Thomas are).  Along similar lines, the Probate Code nowhere prohibits the creation of an interim, separate trust pending distribution of a trust; indeed, section 17206 expressly contemplates the "appointment of a *temporary* trustee to administer the trust in whole *or in part*."  (Italics added.)

---

**7**　For the first time at oral argument, Alexander asserted that the trustee's authority as stated in paragraph 5.1.26 applies only to separate trusts subject to "generation skipping transfer taxes."  To be sure, paragraph 5.1.26 deals *in part* with "generation-skipping . . . characteristics."  But that paragraph goes on to state that "[t]he Trustee shall *also* have" the discretionary authority we quoted in the text above.  Further, as noted in the text, the paragraph makes the generation-skipping tax implications one factor among many to consider in deciding whether to create separate trusts, which is contrary to the notion that the power to create separate trusts is *only about* generation-skipping concerns.

10

**B.** *Alexander's counter-arguments*

Alexander offers what boils down to six arguments as to why the probate court was not authorized to create separate, interim trusts for Nicholas and Thomas.

First, Alexander asserts that the trust's plain language does not authorize such orders because (1) paragraph 4.7 authorizes the creation of a "separate trust" *only* "for a descendant of a deceased child"; (2) paragraph 4.7 is more specific than paragraphs 5.1.26 and 2.3 (which, as noted above, empower the probate court to create separate trusts and to name the beneficiary as the sole trustee if the trustee is at least 40 years old); and (3) the more specific provision controls over the more general provision (see *Lopez v. Sony Electronics, Inc.* (2018) 5 Cal.5th 627, 634-635), such that we are wrong to rely on paragraphs 5.1.26 and 2.3 as authorization for the probate court's orders. Alexander further notes that the drafting attorney of the trust declared that the trust has "no provision for either [brother] to become trustee of his own trust."

We reject Alexander's reading of the trust. Paragraph 4.7 by its terms deals with *distribution* of the trust's assets (and limits the use of separate trusts *as a mechanism for distribution* to the descendants of any of Fred's deceased children); it accordingly does not apply in the pre-distribution context. Paragraphs 5.1.26 and 2.3, by contrast, grant the trustee the power to create subtrusts—and to make beneficiaries 40 or older the sole trustee—at *any time*: Paragraph 5.1.26 contains no time limitation whatsoever, and paragraph 2.3 explicitly refers to the creation of a separate trust for "*any* descendant" while paragraph 5.9.10 defines "descendant" as reaching "a person's children," which would include *Fred's* own children (because, after all, "'any'

11

means 'any'" (*Santa Clarita Organization for Planning & the Environment v. Abercrombie* (2015) 240 Cal.App.4th 300, 312)). Accordingly, the maxim that the specific trumps the general— and hence that paragraph 4.7 limits paragraphs 5.1.26 and 2.3— does not apply in the pre-distribution context at issue here (because there is no head-to-head conflict to resolve). Because the plain text of the trust is clear, Alexander's proffered extrinsic evidence is irrelevant because it cannot be used to contravene the trust's text. (E.g., *Trolan v. Trolan* (2019) 31 Cal.App.5th 939, 949; see generally § 21102, subd. (c) ["extrinsic evidence" permissible "to the extent otherwise authorized by law"].)

Second, Alexander argues for the first time at oral argument that paragraph 5.9 bars the trial court's creation of separate interim trusts. We disagree. That paragraph provides that "[t]he Trustee . . . *may* maintain and administer the assets of [separate] trusts [created under the Trust] as a unit until such time as the Trustee is required to make distribution." (Italics added.) That the trustee *may* manage separate trusts as a unit does not negate the authority conferred by paragraph 5.1.26 to create those separate trusts and appoint a "different . . . trustee" for them.

Third, Alexander contends that the trust only defines the duties and rights of the trustee of a separate trust in paragraphs 4.7.1 through 4.7.5, which pertain *solely* to separate trusts created for descendants of Fred's deceased children at the time of distribution. Because "no similar language" exists to define the powers and duties of a trustee of an interim, pre-distribution separate trust, Alexander continues, the probate court here has essentially created a trustee lacking any defined rights or duties. We reject this contention because it ignores paragraph 2.7, which

12

expressly provides that "Except as otherwise provided in this instrument, *all* successor Trustees shall be vested with all the title, rights, powers, discretions, privileges, duties and obligations of the initial Trustee."  (Italics added.)  Because an interim trustee of a separate trust is a successor trustee, because paragraph 2.7 assigns to "*all* successor Trustees" the rights and duties of the initial trustee, and because "all means all" (*Rubin v. Western Mutual Ins. Co.* (1999) 71 Cal.App.4th 1539, 1547), the rights and duties of interim successor trustees like Nicholas and Thomas are not undefined.

Fourth, Alexander argues that the probate court's creation of interim, separate trusts will, in the words of the trust's drafting attorney, create "chaos" because (1) it might lead to mixed messages should Alexander and the trustees of the separate interim trusts have to speak with the IRS about any asset subject to a separate trust; (2) it might lead to a shortage of corpus to pay the trust's debts and expenses; and (3) Alexander otherwise needs to have constant access to all assets in the trust in order to administer the trust.  All of these concerns could be dealt with by a carefully crafted order addressing these contingencies and issues.  But Alexander decided to concede the validity of separate trusts until *after* the probate court issued its oral ruling and, even then, never proposed any crafting of the orders to address the concerns he now presses; Alexander's tactical call does not render the orders unfair or absurd. (*California National Bank v. Woodbridge Plaza LLC* (2008) 164 Cal.App.4th 137, 143 ["Construction cannot lead to unfair or absurd results but must be reasonable and fair"].)

Fifth, Alexander argues that paragraph 5.5.1—a provision that allows for a distribution to a child's preexisting trust—does

13

not justify the probate court's orders. This provision is irrelevant because it deals with distribution.

Sixth and lastly, Alexander complains that the probate court's orders effectively force him to treat Nicholas and Thomas more favorably than Fred's other children, in violation of the mandate that trustees treat all beneficiaries equally. (See *Hearst v. Ganzi* (2006) 145 Cal.App.4th 1195, 1208 ["'Trustees owe a duty to all trust beneficiaries, and must treat all equally'"].) We reject this complaint. The trust obligates the trustee to ensure that all beneficiaries' shares "have equivalent or proportionate fair market value"; the trust does not obligate a trustee—or the court—to treat all beneficiaries identically during the years-long interim period, at least if their shares are ultimately equal once the trust is finally distributed. The Probate Code also requires beneficiaries to "deal . . . with" beneficiaries "impartially" (§ 16003), but this general mandate does not prohibit a court's order allowing beneficiaries to manage their respective shares in a long interregnum period between the trustor's death and distribution of the trust's assets.

## DISPOSITION

The orders are affirmed. The brothers are entitled to their costs on appeal.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
HOFFSTADT

14

We concur:

_____, P. J.
LUI


_____, J.
CHAVEZ